**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Catholic Health Partners, et al.,            Case No. 3:13CV1259

    Plaintiffs

    v.                                             **ORDER**

CareLogistics, LLC,

    Defendant

       This is a declaratory judgment action by Catholic Health Partners (CHP) and Mercy Health System – Northern Region d/b/a/ Mercy Health Partners (MHS) against CareLogistics, LLC (CareLogistics). Plaintiffs operate healthcare facilities across Ohio and contracted with CareLogistics to provide patient-flow software and maintenance. Plaintiffs seek to terminate their agreement and request that declaratory relief require parties to submit to binding arbitration or, in the alternative, determine the rights, obligations, and payments owed by the parties.

       Pending is CareLogistics' motion to dismiss, asserting that plaintiffs' suit was an anticipatory declaratory judgment action. (Doc. 11). Defendant has filed its own suit for damages against plaintiffs in the Northern District of Georgia arising out of the same set of facts as this action. *See CareLogistics, LLC v. Catholic Health Partners et al.*, No. 1:13-CV-1929-WBH (N.D. Ga. filed June 10, 2013) (the Georgia Action). Defendant argues that it is the "natural plaintiff" in this dispute

1

and that the case should proceed in the Northern District of Georgia.

Also pending is plaintiffs' motion to compel arbitration. (Doc. 20).

For the reasons that follow, I grant defendant's motion to dismiss. This case should proceed in the Northern District of Georgia. As a result, I do not have jurisdiction and the plaintiffs' motion to compel arbitration is moot. I dismiss it without prejudice to plaintiffs' right to seek that relief in the Northern District of Georgia.

**Background**

Plaintiffs CHP and MHS are non-profit Ohio corporations with their principal places of business in Cincinnati and Toledo, Ohio, respectively. CHP consists of regional healthcare systems that include hospitals, long-term care facilities, and wellness centers. MHS operates healthcare facilities in Northern Ohio. Defendant CareLogistics, a Georgia limited liability company, has its principal place of business in Alpharetta, Georgia. CareLogistics provides hospital logistics software which allows, among other things, hospitals to see the live status and availability of beds and manage housekeeping flow and patient transport activity.

CareLogistics and MHS entered into an agreement dated February 11, 2008, pursuant to which CareLogistics licensed its software for MHS to use at one of its hospitals (the 2008 Agreement). CareLogistics and MHS, and eventually CHP, thereafter entered into multiple amendments to the 2008 Agreement. These extended the scope of the CareLogistics software license to additional MHS and CHP facilities. The parties also entered into additional agreements, which contained arbitration provisions, for professional services and joint marketing. CareLogistics disputes the validity of these arbitration provisions.

On January 8, 2013, CHP sent a letter to CareLogistics that purported to serve as "written

notice of termination of maintenance" under the 2008 Agreement "in the event that" CHP later "wish[es] to discontinue use of some or all of [CareLogistics' software] applications." (Doc. 1-5). The parties dispute whether CHP's purported termination was proper and timely.

In February, 2013, the parties began discussing a resolution to their dispute without court intervention. By March, 2013, CHP's Vice President and Associate General Counsel, Kathleen Burns, had joined the parties' discussions, instructing CareLogistics that it should direct all future correspondence relating to the parties' agreements to her.

On April 11, 2013, outside counsel for CareLogistics made a settlement demand, expressly pursuant to Federal Rule of Evidence 408, to Ms. Burns. (Doc. 11-1, ¶ 2). On the same day, counsel for CareLogistics also sent a letter to Ms. Burns detailing the merits of CareLogistics' position, and stated that "CareLogistics is fully prepared to seek all remedies arising out of CHP's breach of the agreements." *Id*.

At some point on or before May 1, 2013, CHP and MHS retained outside counsel, John Gilligan. On May 2, 2013, Mr. Gilligan and counsel for CareLogistics discussed the parties' dispute, including CareLogistics' damage claims and plaintiffs' apparent intent to continue using certain software licensed under the parties' agreements. During the discussion, CareLogistics' counsel communicated to plaintiffs' counsel that the identity of the software applications plaintiffs would continue to use was critical to further discussions about the outstanding amounts plaintiffs owed to CareLogistics. Plaintiffs' counsel agreed to speak with his clients regarding which of the CareLogistics software applications plaintiffs still wanted to continue using and for how long they desired to do so.

On May 23, 2013, CareLogistics' counsel received an email from plaintiffs' counsel

proposing a telephone conference the following day. The parties' counsel agreed to speak the next day, May 24, 2013. On Friday, May 24, however, plaintiffs' counsel requested that the parties' telephone conference be rescheduled for Tuesday, May 28, 2013. CareLogistics' counsel agreed by email, attaching to his email a statement detailing outstanding amounts of roughly $2.3 million due under invoices from CareLogistics for software and related professional services.

CareLogistics' counsel expressly conditioned further settlement discussions on payment of these invoices:

> Care Logistics remains interested in exploring a resolution of the other amounts in dispute (and that we discussed on our last telephone call). However, Care Logistics will first insist upon full payment of the invoices identified in the attached Statement to Humility of Mary Health Partners.

(Doc. 11-1, ¶ 6).

Counsel for the parties spoke on Tuesday, May 28, 2013 as scheduled. Plaintiffs' counsel asked for further documentation of the past due invoices. He also stated he would have to discuss the invoices with his clients and that, after such discussions, he would report back to CareLogistics regarding his clients' position. Later that afternoon, CareLogistics' counsel provided additional documentation related to the past due invoices to plaintiffs' counsel as requested.

The parties did not communicate again until Friday, June 7, 2013 – the day after plaintiffs' declaratory suit was filed. On the morning of June 7, plaintiffs' counsel emailed CareLogistics' counsel seeking a time to discuss "CHP's position." (Doc. 11-1, ¶ 10). Later that afternoon during a telephone conference, plaintiffs' counsel told CareLogistics' counsel that CHP had filed this suit for declaratory relief the previous day. (Doc. 1).

Later that day, plaintiffs' counsel sent an email requesting further information about the past due invoices and supporting materials related to the $2.3 million outstanding balance due

CareLogistics.

Plaintiffs' counsel has not responded to CareLogistics' May 2, 2013, request for confirmation about which CareLogistics software applications plaintiffs intend to continue using.

CareLogistics filed its Georgia Action on the next business day, Monday, June 10, 2013, after plaintiffs' counsel told its counsel about this suit. In contrast to plaintiffs' claim for a declaratory judgment here, CareLogistics asserts substantive claims for breach of contract, promissory estoppel, and tortious interference with business relations.

Later during June 10th, and after CareLogistics had filed the Georgia Action, CHP amended its complaint to include MHS as a party-plaintiff. (Doc. 9).

CareLogistics then filed this motion to dismiss (Doc. 11). CHP and MHS filed a motion to compel arbitration (Doc. 20) in this court. In the Northern District of Georgia, CHP and MHS filed a motion to dismiss, transfer, or stay the Georgia Action. The Georgia court has not yet ruled on that motion.

In its motion to dismiss, CareLogistics argues that plaintiffs' filed their declaratory action in anticipation of its money damages suit. It asserts that plaintiffs, attempting to preempt CareLogistics' choice of forum as the "natural plaintiff," engaged in procedural fencing and lulled Carelogistics' counsel into not filing its suit sooner. CareLogistics asks me to dismiss this action and allow the case to move forward in the Northern District of Georgia.

Plaintiffs deny defendant's allegations about procedural fencing, and, invoking the "first-to-file" rule, insist the case must remain here.

## Discussion

Because the first suit was filed in this court, I must decide whether this case should proceed

here or in the Northern District of Georgia. *See Sutter Corp. v. P & P Indus., Inc.*, 125 F.3d 914, 920 (5th Cir. 1997) ("[T]he court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed."); *see also Daimler-Chrysler Corp. v. Gen. Motors Corp.,* 133 F. Supp. 2d 1041, 1044 (N.D. Ohio. 2001) (Carr, J.) (same). Neither party contests this point.

The purpose of the first-to-file rule is to encourage comity among federal courts of equal rank. *AmSouth Bank v. Dale*, 386 F.3d 763, 791 n. 8 (6th Cir. 2004) (quoting *Zide Sport Shop of Ohio v. Ed Tobergte Assoc., Inc.*, 16 F. App'x. 433, 437 (6th Cir. 2001) (Unpublished disposition)). The rule provides that when actions involving substantially the same parties are pending in different districts, "the court in which the first suit was filed should generally proceed to judgment." *Zide*, *supra*, 16 F. App'x. at 437 (quoting *In re Burley*, 738 F.2d 981, 988 (9th Cir. 1984)).

While the rule's importance should not be taken lightly, I have discretion to dispense with the rule "where equity so demands." *Id.*; *see also Planting Resources, Inc. v. UTI Corp.*, 47 F.Supp.2d 899, 903 (N.D. Ohio 1999) (courts should not apply the rule "too rigidly or mechanically"); *Alltrade Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 628 (9th Cir. 1991) ("The most basic aspect of the first-to-file rule is that it is discretionary."). Exceptions to the rule include extraordinary circumstances, inequitable conduct, bad faith, anticipatory suits, and forum shopping. *Zide*, *supra*, 16 F. App'x. at 437.

Furthermore, under the Declaratory Judgment Act, I have discretion not to hear a declaratory judgment action, even where jurisdiction exists. 28 U.S.C. § 2201(a). *See Zide*, *supra*, 16 F. App'x. at 437 (citing *Brillhart v. Excess Ins. Co. Of America*, 316 U.S. 491, 494 (1942)). A plaintiff who files a declaratory judgment action does not have a right to the forum of his choosing. *Id*.

As noted in *Tempco Elec. Heater Corp. v. Omega Engineering, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987), "[T]he federal declaratory judgment is not a prize to the winner of the race to the courthouse." When a first-filer rushes to the courthouse with a declaratory judgment action, I look to see if the filer brought the suit in anticipation of his opponent's actions. This is an aspect of forum shopping, and I cannot reward the first-filer by allowing him to select the forum of his choosing because he is not the "natural" or "true" plaintiff. *See Int'l Union, United Auto., Aerospace & Agricultural Implement Workers of America–UAW v. Dana Corp.*, 1999 WL 33237054, *4 (N.D. Ohio 1999) (*UAW/Dana*). Thus, the "misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action." *Id*. (quoting *PAJ, Inc. v. Yurman Design, Inc.*, 1999 WL 68651 (N.D. Tex. 1999)) (internal citations omitted).

To determine whether I should exercise jurisdiction over a declaratory judgment action, I must consider whether:

1. the judgment would settle the controversy;

2. the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

3. the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

4. the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction; and

5. there is an alternative remedy that is better or more effective.

*AmSouth*, *supra*, 386 F.3d at 785 (citing *Scottsdale Ins. Co.*, *v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000)).

### 1. Whether the Judgment Would Settle the Controversy

Neither party addresses the first factor of the test. It is unclear whether a judgment here would settle the controversy, so I assign no weight to this factor.

If I grant some form of declaratory relief, it is not certain whether arbitration would occur because I cannot decide plaintiffs' motion to compel arbitration until I have resolved the jurisdictional issue. Even if binding arbitration does occur, there is always the possibility that either party can challenge what the arbitrators do as either exceeding the scope of their powers or in manifest disregard of the law. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995). While these challenges are rarely successful, there is still a chance that a judgment here would not settle the controversy.

Furthermore, even if I were to grant declaratory relief, it would not settle the entire controversy between the parties. CareLogistics' Georgia Action raises several claims including breach of contract, promissory estoppel, and tortious interference with business relations that would still need to be resolved.

While CareLogistics' could raise these as counterclaims, this may defeat the purpose of this factor. The court in *AmSouth*, *supra*, 386 F.3d at 785-86, dealt with a similar issue and simply concluded that this factor did not assist either party:

> The crux of the argument between the parties is whether or not the ability of the [defendants] to file counterclaims that will dispose of all issues in the declaratory-judgment actions can be considered in determining whether the judgments would settle the controversy. Each side argues that the rule the other proposes will swallow this factor, as counterclaims will so often be possible or even compulsory that all declaratory judgments will either be able to or not be able to settle the controversy. We conclude only that in this case, this first factor does not weigh heavily in favor of or against allowing these actions.

For the same reasoning, I find that this factor does not assist either party.

### 2. Whether the Declaratory Judgment Action

## Would Serve a Useful Purpose
## in Clarifying the Legal Relations at Issue

A declaratory judgment action serves a "useful purpose" when the declaratory plaintiff will suffer injury if the court fails to clarify the parties' legal relations. *AmSouth*, *supra*, 386 F.3d at 786; *see also Liberty Mut. Ins. Co. v. Wagner-Smith Co.*, 2007 WL 710163, *2 (E.D. Ky. 2007) (no useful purpose in a contract claim "where the alleged events giving rise to liability have already been completed").

In *AmSouth*, the court recognized an exception to the first-to-file exception – while courts typically decline to hear declaratory actions when there is a subsequently-filed coercive action by the natural plaintiff, this does not hold true "when some additional harm, not merely waiting for the natural plaintiff to sue, will befall the declaratory plaintiff in the meantime." *Id*. The court gave an example of such harm: "a party with an ongoing contractual relationship who has been accused of breach can go to court and have the contract definitively interpreted, thus allowing it to conform its behavior to the law and stop the potential accrual of damages." *Id*.

Plaintiffs argue that they base their request for declaratory relief on the parties' dispute over terms of their ongoing contractual relationship, thus bringing the dispute squarely within *AmSouth*'s example. Plaintiffs contend that questions regarding the money they allegedly owe to CareLogistics and their continued use of CareLogistics software are not defensive in nature but substantive issues needing to stop accrual of damages. Moreover, plaintiffs argue their request for declaratory relief is a coercive action because the right to enforcement of arbitration clause is a substantive rule.

Defendant argues plaintiffs do not face a risk of additional harm because it has already filed, rather then merely threatened, a coercive action against plaintiffs. Defendant further contends that there is no present or continued wrongdoing on its part that requires immediate clarification of each

party's rights. Defendant concludes by noting that the Georgia Action eliminates the usefulness of this action because it provides an appropriate forum to adjudicate the parties' entire dispute, including the issue of arbitrability.

Defendant's argument is persuasive. In *AmSouth*, the parties engaged in settlement negotiations for two years. Plaintiffs filed a declaratory judgment action during the negotiations. The court found that plaintiffs "incurred no further loss while settlement negotiations continued, and at the time they filed, even the 'uncertainty' of awaiting suit on past behavior would have extended less than two weeks." *Id.* at 786. The court noted that if plaintiffs had wanted to, they could have ended settlement negotiations and if defendants did not promptly file suit, a declaratory action could have been an appropriate vehicle for judgment. *Id*.

Here, CHP and MHS had been in settlement discussions for four months and, like the *AmSouth* plaintiffs, made no showing that they incurred further loss while settlement negotiations continued. CareLogistics' demand of $2.3 million, though based on disputed invoices, is a fixed, preexisting amount more appropriately addressed in a coercive action. Plaintiffs' continued use of software is also not grounds for declaratory relief as they still have not responded to CareLogistics' request about which software they intend to continue using. Thus, it is not possible to know what type of damages, if any, will even accrue.

While the facts here may not be as egregious as those in *AmSouth*, I find that this factor weighs against the exercise of jurisdiction over plaintiffs' declaratory action.

### 3. Whether Plaintiff is Using Declaratory Remedy Merely for "Procedural Fencing" or "to Provide an Arena for a Race for Res Judicata"

CareLogistics contends that plaintiffs purported to be engaged in settlement discussions for

at least four months, up to and including the date they filed their action for declaratory relief. CareLogistics argues plaintiffs lulled it into believing that a settlement was still possible and then filed this declaratory action to secure their forum of choice. Defendant points out that in their rush to the courthouse, plaintiffs forgot to include MHS in the complaint and had to amend it.

Plaintiffs argue they did not file suit in the midst of settlement discussions. Rather, plaintiffs contend that CareLogistics terminated negotiations by expressly conditioning further discussion on payment of $2.3 million. Thus, plaintiffs argue, their claim is not anticipatory. Furthermore, plaintiffs state they did not forum shop by choosing the Northern District of Ohio because the healthcare facilities in question are located in Ohio and this district is more convenient for witnesses and production of evidence.

I find CareLogistics' arguments convincing and that plaintiffs engaged in procedural fencing when they filed for declaratory relief.

CareLogistics had indicated on multiple occasions its intent to file suit against plaintiffs if settlement discussions were unsuccessful. While defendant did condition further settlement discussions on the payment of $2.3 million, plaintiffs did not reject this condition but instead asked for further documentation supporting the demand. Having done so, plaintiffs' core argument that CareLogistics terminated negotiations is an attempt at rewriting history. CareLogistics provided the requested documentation and waited for a response. Instead of hearing one way or another, plaintiffs filed the declaratory judgment action and did not notify CareLogistics until a day later during a scheduled conference call to discuss "CHP's position."

If plaintiffs wanted court intervention, they should have been clear about their intentions. *See, e.g.*, *Zide,* 16 F. App'x. at 438 ("If Plaintiffs' conduct was not mere deceptive gamesmanship,

11

then they would have informed Defendants that the did not intend to make another settlement offer and would prefer to seek a judicial resolution."); *AmSouth*, 386 F.3d at 786 (plaintiffs could have stopped the "danse macabre" of settlement negotiations by ceasing them and allowing the natural plaintiff to promptly file suit.).

A court should view the issue of whether a first-filing plaintiff lulled its opponent into staying its hand from the perspective of the opponent, not the first-filer. Only in that way can a court fairly assess the effect of a first-filer's actions – whether intentional or not – on its opponent. In this instance, it is entirely reasonable from the perspective of CareLogistics that it believed settlement discussions were still ongoing and it need not proceed to file suit.

While the plaintiffs in *Zide* may have acted more egregiously – in that case, plaintiffs continued written correspondence regarding settlement even though they had filed their declaratory relief actions – radio silence from CHP and MHS for several days does not absolve them if they indicated, as they did, that settlement was under consideration.

Furthermore, plaintiffs' argument that they were not forum shopping because the Northern District of Ohio is an appropriate forum also fails. The forum's convenience for witnesses and production of evidence is irrelevant. As stated in *AmSouth*, *supra*, 386 F.3d at 789, "whether the forum chosen by the declaratory plaintiff is 'logical' can have only a minimal value in determining whether procedural fencing has occurred." The appropriate question is not whether a party has chosen a better forum but rather whether the declaratory plaintiff filed first to choose the forum.

I have previously explained the difference between proper forum selection and inappropriate forum shopping:

> A plaintiff seeking redress for a cognizable injury is entitled, to the extent able to choose among several forums, to select the one that it finds most attractive. Forum

12

>shopping, on the other hand, occurs when a party, perceiving that it may find itself forced into a disadvantageous forum, seeks to manipulate procedural devices to secure an advantage which, were those devices not available, it could not employ to defeat its opponent's choice of forum.

*UAW/Dana*, *supra*, 1999 WL 33237054, *4.

In that case, I found that plaintiff's declaratory judgment complaint was motivated by improper forum shopping because of the timing of the suit "which was filed even before [plaintiff] gave [defendant] any other answer to [defendant's] inquiries about its intentions." *Id*. *5. This strongly suggested a preemptive purpose.

CHP's and MHS' actions are not distinguishable from those of the *UAW/Dana* plaintiff. Instead of responding to CareLogistics' demand, plaintiffs filed this declaratory action so quickly that they left off one of the co-plaintiffs. This suggests that plaintiffs tried to gain procedural advantage by rushing to file first.

I find that this factor weighs heavily in favor of dismissing the declaratory action.

### 4. Whether Use of a Declaratory Action Would Increase the Friction Between Federal and State Courts and Improperly Encroach on State Jurisdiction

Because the Georgia Action is also in federal court, this factor is not relevant and does not weigh against or in favor of either party.

### 5. Is There a Better or More Effective Alternative Remedy

While neither party addresses this factor, I find that it weighs slightly in favor of plaintiffs, who seek arbitration.

Arbitration is an alternative remedy that may be more effective than defendant's Georgia Action. "Federal law favors arbitration." *Landis v. Pinnacle Eye Care, LLC*, 537 F.3d 559, 560 (6th Cir.) (citing Federal Arbitration Act, 9 U.S.C. § 1 et seq.). In this case, resolution through arbitration

may be ideal given the complex set of disputes arising from a lengthy relationship with multiple amended contracts. The parties are presumably knowledgeable and sophisticated, and arbitrators are likely to have a similar degree of knowledge and sophistication about the issues at hand – more so than either a judge or jury.

That being said, I cannot reach the issue of arbitrability in deciding this motion to dismiss. I merely recognize its existence as an alternative remedy. *See, e.g., AmSouth*, *supra*, 386 F.3d at 791 ("Beyond recognizing that an alternative remedy exists, we are unsure that this factor weighs heavily in favor of or against entertaining these declaratory actions.").

## Conclusion

Given the timing of plaintiffs' actions and the nature of relief sought, I am persuaded that plaintiffs' engaged in procedural fencing. CareLogistics is the natural plaintiff and this case should proceed in the Northern District of Georgia.

For the foregoing reasons, it is hereby:

ORDERED THAT:

1. Defendant CareLogistics' motion to dismiss (Doc. 11) be, and the same hereby is granted;

2. Plaintiffs' amended complaint for declaratory relief (Doc. 9) be, and the same hereby is dismissed without prejudice; and

3. Plaintiffs' motion to compel arbitration (Doc. 20) be, and the same hereby is dismissed without prejudice.

So ordered.

/s/ James G. Carr
Sr. United States District Judge